Case number 15-1295, National Association of Telecommunications Officers and Advisors et al. Petitioners v. Federal Communications Commission et al. Mr. Kinnaird for the petitioners, Mr. Carr for the respondents. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.  Thank you. May it please the Court, Stephen Kinnaird for petitioners. The FCC here seized upon narrow streamlining legislation to shed statutory duties that it had long been keen to escape. The Commission violated the statute in multiple respects, and I begin with the most straightforward violations. First, the FCC violated the Stellar Act, which instructed the Commission to establish a streamlined petitioning process for small operators, not to abolish it entirely for all cable operators, as the FCC did. And the Act instructed the FCC not to construe the legislation to have any effect on the operator's duty, its duty to prove the existence of effective competition. And the FCC instead improperly relieved all cable operators of that duty. Second, the mass sua sponte termination of the regulatory jurisdiction of 23,000 franchise authorities offends Section 623A5. A5 places an express condition precedent upon the Commission's review eradication power, namely a petition from the cable operator or other interested third party. This Court in Railway Labor emphasized that agencies must honor express conditions precedent and cannot claim an alternative power under Chevron Step 2 simply because Congress did not expressly withhold it. Third, the Commission's new presumption cannot be squared with the statutory requirement to make effective competition findings in each franchise area. If these recent statutes haven't been passed, is there any reason to doubt that the Commission could, simply within its discretion to govern proceedings before it, have approached this as it did, flipping the presumption that it imposed in 93? There wouldn't be the same negative command that it's in Stellar, but I don't think that they could do the presumption in the way that they did. And I would emphasize that petitioners... Well, let me just follow it up with you, because if they could have done that but for the new statute, that everything depends upon the negative implication from the new statute, right? I don't think everything does. It's certainly a ratification of the existing rules, but even within the confines of the Cable Act, they could not erect this presumption of effective competition. And I want to emphasize that petitioners here favor competition, but only when the Commission finds it locally as the Congress required, because deregulation absent competition harms consumers. And the national market share of DBS providers is not prima facie evidence that, if unrebutted, proves effective competition in 23,000 localities. And the Court in the Keystone-Cole case, and that's 151F3-1096-1109, held that even a high statistical probability that any individual has a trait is not proof that a specific individual does. Well, this presumption is rebuttable. It's not proof either. Well, but the key, yes, it's a rebuttable presumption, but the key... So it's essentially an allocation of the burden of going forward. Well, that's right, but in order for there to be a finding, there has to be evidence. So the evidence that the Commission relied on to create the presumption has to actually serve as prima facie evidence. That's what the Supreme Court in Turnipseed said, and this Court in Chemical Manufacturers. If unrebutted, it has to be prima facie evidence of local competition. Mr. Carter, can you help us to understand why this isn't prima facie evidence? As I understand the record, the satellite providers are present everywhere. They are. And so the first prong of the inquiry is math, right? There's enough homogeneity that that would probably be met everywhere, yes. And so the challenge is with the second prong. Is it the 34% market penetration by other providers? Well, you have to be careful with that number because it's 34% if you include the telcos, but the telcos are only in, I believe, it's about, if I recall, 35% of jurisdictions, so they cannot justify a national figure. So it's really the 25.6% of DBS providers. And we know from the Massachusetts data, which is the only data we have, that 37% of the jurisdictions in Massachusetts do not meet the 15% threshold, and that goes to the race. Excuse me, but there are only three petitions, right, presented by local jurisdictions, Massachusetts being one of them. That's right. So isn't that suggestive that, in fact, the presumption is met factually in almost everywhere? It is not, Your Honor. First of all, it makes sense for local franchising authorities to defer incurring this expense until this appeal is resolved. Secondly, the FCC cannot make that claim because they have only 90 days to file it. Well, yes, they can always go back and bring forth the evidence and reclaim the jurisdiction. Wouldn't it make sense from the point of view of any local jurisdiction or state to file and then wait for the outcome of the appeal? Well, it's very costly, and there are lots of reasons small municipalities won't do that. Why is it costly if all they have to do is submit a paper saying the DBS operators have less than 15%? Well, because sometimes you have to make adjustments. The contested proceedings are going to be quite expensive. Are they going to be contested just before making that submission? Well, no, the submission may be contested by the cable operator. Oh, I understand that, but if a jurisdiction says, here to the FCC within 90 days, here's our submission, it appears that in our jurisdiction the DBS provider in central Massachusetts or in the Berkshires doesn't have 15%. Well, then it's on hold while the appeal goes forward. True. They have to purchase that, and the expense of that was not known and in the public record of what it would be in every jurisdiction. But I think the key point is that the FCC held under the prior rules that the failure of a cable operator to file an effective competition petition was not evidence of the absence of effective competition. So it cannot logically hold that the failure of a franchising authority to file a petition or file a certification is evidence of the presence of effective competition. No, and it didn't. I'm just asking this after the fact, not that we have evidence, the public didn't notice about three files. Right. The petition didn't say that. Right. But I think that what the Massachusetts data does show, unless one thinks it's an outlier, if 37% of the jurisdictions don't have it, the universal presumption doesn't work. Are the ones in jurisdictions or population? No, those are 37% of the franchised areas do not meet the 15% threshold. So it really shows that this presumption does not work. And all the commission did in its order was, for example, paragraph 7, it said that marketplace realities cause us to believe that the reason that all cable operators who do not file effective competition petitions actually face effective competition, but it's just too costly for them. This shows that that was just, that's in paragraph 7. In the joint appendix, it says, it's on the 807, the last sentence, it says marketplace realities cause us to believe that in nearly all communities where cable operators have declined to file effective competition petitions, effective competition is present, but the cable operator has not found it worthwhile to undertake the expense. And they begin in paragraph 25, they again make the baseless claim that it's in nearly all communities. They had absolutely no evidence to do that, and that's what the Massachusetts data shows. And it's just simply a problem with trying to prove an individual fact by a national average. And we gave the example of how if the average U.S. rainfall is 30 inches, that does not prove that every town, even in the Nevada desert, has 30 inches or even more than 15 inches. You just cannot make that proof based on statistical probability, at least absent homogeneity across individuals, which they don't show. And I think the Keystone-Cole case... What you just said is true, that no presumption could ever be made. No, that's not, we're talking about the use, when presumptions are proper, they are based when there's an actual association of facts about some individual or entity that is the ultimate issue, right? So there has to be actual association of facts, which is absent from... But Mr. Connard, either way there's a presumption. I think just building off of Judge Ginsburg's question, either way there's a presumption. There's either a presumption of no effective competition, which was the previous status quo, or there's a presumption of effective competition, and then it's an allocation of burden. So I take it you have an argument why the presumption of no effective competition is the requisite default presumption under the statute? No, Your Honor, I think there is no need for a presumption either way. It doesn't have to be a presumption. There is a presumption. Either there's a presumption that there's not effective competition, and then one has to show that there is in order to get out from under the regulation, or the regulation rests on a presumption that it's... I think I've just talked myself into a corner, but there is a presumption either way. There's either a presumption of what one has to show is competition, or there's a presumption that there is competition and what one has to show is that there's not. There's a baseline either way. I would respectfully disagree, and in fact the FCC going forward, for all the jurisdictions that have certified, they have said the presumption is gone. You just have to come forward and bring forth evidence of effective competition. There is no presumption going forward for future transgressions, and all you need is evidence. You don't have to have a presumption. They do have to have evidence. And the question is, is the evidence simply the national market share data, or do they have to have franchise area evidence? And I think in this case it's plain it has to be franchise area. It's readily available. There's nothing that would prevent the commission from ordering, for example, the top five cable companies who have 80% of the market say, show us the presence or absence of effective competition in all your jurisdictions. There are lots of ways for them to do that, and there are lots of ways also to implement stellar, and NAB put those, and they were discussed at paragraph 16 of the commission's order. I would like to address the DMA evidence and make four points on that. First of all, the commission made no findings about DMA evidence, did not analyze the record, even though it has access to the DMA Kagan data, didn't even put it in the record for review. It simply reported an interested party, NCTA's, characterization of that data. Second, DMA evidence has the same problems because there's on average 150 franchise areas per DMA. Third, even if DMA evidence were representative and the presumption should require proof of the franchise area's DMA, that's not done. And fourth, what the NCTA said was that most of the jurisdictions were about 20. Well, most is a wiggle word, and it suggests that there might be between 15 and 20 percent in a number of jurisdictions which would defeat any presumption. So that evidence can't support if the commission rises or falls on the national market share. So I think that's an important point. I would also emphasize in terms of any default by franchise authorities that effective competition under the statute also affects a number of provisions of the statute that have nothing to do with local franchise authorities, and there are at least four. First, subsection K, which imposes on the commission a duty to report the difference in prices between jurisdictions where it finds effective competition or not. Subsection B, which requires the commission to consider those differences in forming its rate regulation. Subsection D, which puts an independent duty upon the cable operator to not to or to maintain a uniform geographic structure and not to engage in predatory pricing with regards to multiple dwelling units if it does not face effective competition. And finally, the now sunset provision of C, where the commission at the time of the act used to have its independent regulatory authority over a cable programming service. So there really is no way that you – the plain fact of the matter is the reason that Congress did not make the requirement of a finding of effective competition contingent upon any act or duty of the local franchise authority. This is an act where Congress knew back then and still today that effective competition will vary by locality. They wanted findings of the commission. If the commission doesn't want to maintain that duty and finds it anachronistic, it can go to Congress. I see my time is almost up unless there are more questions. We'll give you some time in reply. Thank you. Mr. Carr? Good morning, Your Honor. May it please the Court, my name is James Carr. I represent the Federal Communications Commission. I thought we recognized you. Yes. My first point I'd like to make is what Judge Pillard was talking about concerning allocations of presumption, and Judge Ginsburg got into it a little bit too. Presumably to have an efficient process for finding effective competition, you need to put the burden of production somewhere. And Mr. Kinnaird suggested that you could just not have any sort of presumption and just have people come forward with evidence. But I would point out that in paragraph 7 of the commission's order, JA6, it talked about how it had over the last two years or so processed about 228 effective competition petitions, and that was with a presumption. It took two years to do all of that. By petitioner's count, there are 23,000 of these franchise areas. So it makes perfect sense for the commission to use rebuttable presumptions to make this process more easy, more efficient. Clearly the original rebuttable presumption of no effective competition that had been adopted in 1993 no longer makes any sense. That's a little unclear. I take it that that's your position, and I do agree that there has to be a presumption somewhere. But I have a few questions about the data on which the commission based its decision to shift the presumption. One is that the fact that there's a very high degree of success in the petitions that are brought seems to me a little bit of a selection bias problem because presumably the petitions that are brought are in the cases where they think there's adequate evidence to show. I understand that, Your Honor, and that's why the commission was not relying exclusively on that. I think the commission saw that pattern and then decided to focus more on the general market evidence to see what it could find, and that's really the crux of what it was relying on. Right, that's the crux, and the general market evidence seems to be general market evidence with respect to satellites because by their nature they're offered everywhere. With a footnote, what about when you live in a dwelling where your landlord won't let you put up a satellite-receiving unit? But it's the second kind of data that I'm really not that persuaded by, or that I'd like your help walking through how, in the record, why isn't the Massachusetts situation typical? Do we have any basis to think that this 26 percent market penetration is actually distributed, or is it like the water in Nevada where it's dry and you can't rely on average rainfall figures? It's actually 34 percent overall, Your Honor, and I understand the DBS numbers are at 26 percent. It's 34 percent overall. That is more than double the figure that is needed for penetration to satisfy the second part of the test, and I think the commission's reasoning was given that the national average number is so high, it was reasonable to assume, barring some sort of major deviation from the mean, that the vast majority of franchise areas would have at least a 15 percent competitive penetration rate in each area. But tell us more about the structure of the industry because it doesn't actually seem intuitive to me at all. It seems like if I'm a cable provider, I'm going to be providing it in the compact areas, in the cities where it's cheap and easy to reach a lot of households, and there are going to be vast areas that I wouldn't be interested in serving and lots and lots of households where it wouldn't be worth my while. Do you have anything you can point to that assuages that kind of concern? Well, again, Your Honor, I think the only point that I think petitioners have been trying to make is that there could be a large cluster of franchise areas that are on the very low end, a major deviation from the national average, and I do believe that the DMA evidence in the record. Is it in the record? Yes, it was submitted for the record by NCTA, the Cable Trade Association, and it's discussed in paragraph 9 of the commission's order at Joint Appendix 8. And that evidence indicated that in each of the 210 designated market areas that cover the United States, and my understanding is that those areas encompass everywhere except for about a dozen communities in Alaska. So it's a comprehensive national study. These are Nielsen-defined markets based on viewing patterns, and the finding there was that in each of those designated market areas, more than 15% of subscribers were subscribing to Cable's competitors. So, in other words, the test was met. Now, the commission is not saying that that means definitively that in each franchise area there will be effective competition because, understandably, the DMAs are larger than a single franchise area. Typically, they encompass multiple franchise areas. The point is simply this. There is not any evidence anywhere in this record, not any evidence that petitioners have brought up, that shows that there is some sort of marked deviation from the mean that would lead us to expect that there was a significant cluster of franchise areas that didn't meet the 15% threshold. That's the DMA data that relies on the Kagan study, which is not actually in the record, right? I think Judge Ginsburg had a question. Yes, I'm sorry. I was elbowing him out before. Okay. And what about the areas in which relatively recently a franchise authority had sought, had received an adjudication of no effective competition? There they have to go back again and redo that in light of the blip in the presumption? They presumably would have to come forward. And as the commission pointed out, and we mentioned this in our brief, the commission specifically asked in the NPRM, are there any specific geographic areas we should exclude from the presumption? No one raised a peep about this argument. So the commission, I suppose the commission could have said, areas where there have been findings of no effective competition in the last three years, we'll give them a pass. I would argue that given that this finding was just made, it should be a relatively simple matter for the local franchising authority to confirm that information. It's also possible that over the last two, three years, the competitive climate has changed, and in that particular franchise area, there is no longer evidence that justifies a finding of no effective competition. Now, I wanted to discuss the Massachusetts evidence, which Mr. Kinnaird has relied on so heavily. And I think his argument there misses the forest for the trees. As Judge Ginsburg noted, the commission gave franchising authorities 90 days to file in order to hold on to their existing certifications. Three franchising authorities filed. One of them failed to make a showing, the county in Kentucky. The only franchising authorities that were able to establish effective competition were Hawaii, which showed that there was no effective competition in two franchise areas in that state, and Massachusetts, which showed that there was no effective competition in about 118 franchise areas, which is about 35%, 40% of the franchise areas in that state. That's 120 franchise areas for the entire country. And when you keep in mind that, as petitioners themselves admit, there are about 23,000 or so franchise areas nationwide, that's a relatively small number. It tends to confirm the commission's view that the shifting of the presumption made sense because it is more likely that the volume of filings that will try to rebut the new presumption will be much less than the volume of effective competition that cable operators were filing under the old presumption. Just to help with sort of the common sense absorption of that point, why would the Massachusetts situation be atypical in terms of cable providers' incentive to offer competitive products? I don't know, Your Honor. I don't really have a particularly good answer for that. I think one thing to keep in mind is that this is more from the regulators' perspective than from the cable operators' perspective. Not every community where there was a finding of no effective competition decided to regulate cable rates. It's an expensive proposition. Massachusetts made a determination that it was worth their while to regulate cable rates, and they have a state body that regulates, which is different from some other communities where there is a more local governmental presence. So they obviously had a keen interest in making sure that they would retain the regulatory authority in those areas where they could, and that's why they filed the – I think the filing, by the way, shows that the rebuttable presumption works, that where there is evidence that there remains an absence of effective competition, the franchising authority can come forward and can make a showing. But like with all presumptions, there's a concern about who's in the best position to bear the burden, and you accurately point out that in many areas it's not a state body, it's a smaller local body, and the question of whether they're monitoring the commission's call for input and responding to that 90 days and giving you all the information you wish you had is a very real question. I don't think it should be, Your Honor, for this reason. Each franchising authority that takes on the responsibility of cable rate regulation has an obligation to make sure that its rules are consistent with FCC regulations. That's the case under the statute. And this may be part of the reason why, in addition to the expense, a lot of local areas decided we're not getting into this business, but the ones who did were basically held responsible to keep an eye on what was going on at the FCC, so it should not have come as a surprise to anybody. And by the way, the lead petitioner here, NTOA, the Trade Association, presumably has a responsibility to notify its members that this was going on, and it appears that at least some of the members know about this litigation because, according to Mr. Kinnair, they decided not to come forward with what evidence they might have to see how the litigation might come out. So I'm assuming that these franchising authorities are highly motivated to monitor the commission, and they're also highly motivated in a situation where they believe that the commission has improperly taken away their regulatory authority to come forward with evidence and say, hey, wait a second, we do not have effective competition in our community. We need to retain our certification. And after a 90-day period, we had only three franchising authorities come forward, only two of which were able to make the showing. I'd like to ask you a question about that. Yes, Your Honor. As Judge Ballard pointed out in the particular deny, there's a tremendous selection bias in the 200 or whatever. So you said, well, that's why the commission didn't rely on that exclusively. I think that's what you said, is that it? Yes, the earlier, yes. So my question is, did it rely on it at all? Because if so, and the selection bias is fatal, then we have a channeling problem. Oh, I think it relied on its experience in the recent period with the previous effective competition conditions, if that's your point. It refers to the fact that it had received, what was it, 200 and some? 228, and it granted 99.5%. That's right. So if it relied on that to any extent, and if that's not in any way a reliable figure because of the selection bias, and it relied on two other factors as well, we have a channeling problem and the commission would have to reaffirm or not its position without regard to that factor. I don't read the order that way, Your Honor. I think the commission's principal reliance was on the nationwide data. I don't know if we can decide which is the principal reliance, but it certainly expended more ink on the nationwide data. It did. And I think that's an indication of the commission's mindset here. Maybe the way out of this, if you want to adopt it, is that the relevance of those data is that had the numbers been significantly different, had it been only 70% rather than 99.5%, they would have a problem. Well, and I think the commission pointed out that it recognized the selection bias and it said that this was a situation where these particular petitions were at least not inconsistent with what it understood to be the state of the marketplace. And that's why, yes, 99.5% is a much higher number, but it's more consistent with it. I say it's less of a reason for going forward than it is the absence of a reason for stopping it. Yes, yes. And I think also another concern that the commission had, and this was a concern that Congress had when it enacted Stellar, was the fact that there were a number of small cable operators that also were being placed to the burden of having to file these effective competition petitions. And if you look at joint appendix page 114, there was a letter submitted by the American Cable Association detailing the various burdens that the small cable operators were having to face. So while the commission recognized there were also going to be burdens on franchising authorities, it believed that there would be fewer opportunities, there would be relatively few franchise areas where there would be sufficient evidence to come forward and file a petition. So I'm sorry, Your Honor. So Congress said let's streamline this, and the commission streamlined it by actually flipping the presumption. And I have a bit of a question of how that squares with the statute, with 623, which, as I read it, creates the mechanism by which a cable operator can seek commission review of whether there is effective competition. And, you know, this relates a little bit to a case where the kind of issue that we faced a couple days ago in another FCC case, whether the statement of the authority there carries any negative implication that that is the way and the only way for triggering a commission finding of effective competition. I understand your point, Your Honor. I would argue that the commission did not rely on A5 at all, and I would argue that A5 is not really the relevant provision here, and I'll explain why. If you look at the language when it talks about revocation of jurisdiction, that provision nowhere mentions effective competition. When it talks about revocation, it talks about a commission determination, quote, that the state and local laws and regulations are not in conformance with the regulations prescribed by the commission under subsection B of this section. It's clear what Congress was contemplating there was some sort of inconsistency between local rules and FCC regulations. And that becomes even clearer when you look at the discussion of A5 in the very next subsection, A6, where it says that the commission disapproves of franchising authority certification under paragraph 4 or revokes such authority's jurisdiction under paragraph 5. The commission shall exercise the franchising authority's regulatory jurisdiction under paragraph 2A. The idea was that it was understood that there would still, in fact, be jurisdiction. We're talking about areas where there is no effective competition. The question of whether or not there is effective competition in an area is something that is addressed in A2, a separate provision, where it says if the commission finds that a cable system is subject to effective competition, the rates for the provision of cable service by such system shall not be subject to regulation by anybody, federal, state, or local. And that provision does not say anything about a petition process. And the commission read A2 to permit it to make findings with respect to effective competition at any time, whether or not it received a petition or a request from a third party. That, it seems to me, is consistent with Congress's view that it wanted this process to move very efficiently and very promptly so that as soon as the commission was in a position to make a finding with respect to effective competition that would end rate regulation, that nothing should delay it, that rate regulation should end as soon as the commission was able to make a finding that there was effective competition. But the standard process was pursuant to petitions. Well, the process, again, Your Honor. Isn't that the whole point of STELA was we don't want to burden these potential petitioners in having to do this? Was that not under 623A-5? Well, A-5 was strictly about revocation in that context. There's a separate provision where, actually under A-4, it talks about approval by the commission. Franchising authorities initially filed certifications. Once the FCC made a finding back in 1993, adopted a rebuttable presumption, there was no effective competition. At that point, franchising authorities that were interested in rate regulation came to the commission with certification filings, and among other things, they indicated they had no reason to believe that the rebuttable presumption was incorrect. The commission then reviewed those certifications, made sure they were consistent with the requirements under A-4, and then granted them. So there's that petition process. Now, there is also a separate petition process. The commission has a separate rule that allows for cable operators to file effective competition petitions. I would argue that that rule really has nothing to do with A-5. The commission made its own decision for its own processes that it made sense to have a petition process that would allow cable operators to come forward. But A-5 is dealing with a different situation where, for example, a franchising authority may have taken action that is inconsistent with FCC regulations. I'll give you an example. There was a 1995 case involving a cable vision outfit in Florida where Dade County and some of its municipalities were both exercising rate regulation authority over the same cable systems. The FCC found, when there was a petition for revocation by cable vision, that that was inconsistent with federal rules to have two local bodies regulating rates, that it had to be one. It had to be a unitary process. So that would be an example of a revocation petition under A-5. So the authority for the commission rule that allows cable operators to seek a ruling of effective competition, in your view, is 623-A-2. I would say it flows under A-2, yes. And that rule, just so I have it in my notes, the commission rule on the petitioning is? There is a commission rule, 76.907 is the rule. And you'll notice that's a rule dealing with effective competition petitions. There is a separate rule, 76.914, that deals with petitions for revocation. So I think the commission itself, in creating separate rules, indicated that it had an understanding that effective competition was a different matter from what was being discussed in A-5. All right. If there are no further questions, I'd just like to say I think the commission did hear what regulatory agencies are supposed to do. It exercised its congressionally delegated authority to amend its rules in response to changed circumstances, and the Court should affirm. Thank you. Does Mr. Canuck have any time? All right. Why don't you take a couple minutes? All right. Thank you. I'll try to be very brief. Number one, on the revocation, paragraph 101 of the 1993 order says that A-5 is the basis for revocation for emergence of effective competition. And that makes sense because A-5 is for inconsistency with the subsection, which includes 1 and 2, not just paragraph 3. Elsewhere, the statute refers to paragraphs. Second, you can impose a burden of production without a presumption. But the distinctive part of this statute is the requirement of a finding of effective competition in each area. Imposition of a burden of production is a separate question from whether there's actual evidence that could, if unrebutted, stand as prima facie evidence of local competition. The national market share does not do it. Stellar says even if there has to be a burden of production, keep the duty on the cable operator. Fourth, I would also disagree with the repetition by Mr. Carr that says that the vast majority of jurisdictions don't have effective competition. There's really nothing in the order, and Massachusetts data disproves that. If Massachusetts hadn't filed, the commission would have filed, would have found effective competition in 100 percent of jurisdictions, and therefore left 37 percent vulnerable to deregulated cable pricing where there was no competition. This can't be the rule. The commission has to do more. The commission rushed through this process because it was under the 180-day timeline of Stellar. It didn't do the work. Whether it could do the work on some other kinds of modeling, that's an open question. This has to go back. I would agree with Your Honor on the Chenery point. They definitely relied on the self- Did you argue that? We did argue that that was not a proper basis for their finding because it was self-selected. I don't know if we put it in terms of Chenery, but we did argue self-selection. And I would point out that if the commission is going to find failure to file to be probative of the absence or presence of effective competition, the failure of cable operators to file in 23,000 jurisdictions would have compelled them to find absence of effective competition. The second or third point you just said was Stellar says to keep the burden on the cable operator. Yes. But you're not suggesting that that's anything other than the burden of proof. That would be that what it says is the duty to prove. Yeah. Right. So I think that's exactly what they kept on the cable operator. And the commission itself says it makes no sense to have a more stringent rule on the small cable operator than the big cable operator. I think the only fair interpretation of this act is they were ratifying the entirety of the rules. And I think in terms of the cost prohibition, they say it's too costly for the cable operators. Local municipalities don't have money. And the five major cable companies control 80% of the market. They have plenty of money to do these cable petitions. So I think for all these reasons, both in terms of a step one statutory violation of Chevron and also for arbitrariness and capriciousness and failing to show rational nexus for this national data to prove local competition, this order needs to be set aside. Thank you. Thank you.
judges: Henderson, Pillard, Ginsburg